John Borrowscale & another *vs.* Royal Bosworth & another.

A cargo of coal was ordered from a mining corporation directly through its treasurer, and was shipped in the name of the corporation directly to the buyers as consignees. At the time of receiving the order, the treasurer told the buyers that certain parties were the selling agents of the corporation, of which fact the buyers had other information also; and he afterwards told the agents that he had obtained the order for them. The bill of lading of the coal was forwarded through the hands of the agents, who sent it to the buyers with a bill for the price of the coal as due to themselves, which bill the buyers did not return for ten days; and, on receiving the bill of lading, the agents insured the coal in their own name, and, according to their usual course of business in sales made by themselves, credited the corporation with the price of it, and charged the corporation with a guaranty commission. *Held,* that the agents could not maintain in their own name an action for the price of the coal.

Contract on an account charging the defendants, Royal Bosworth and Edward S. Hamlin, partners under the firm of Bosworth & Hamlin, with the price of a cargo of coal, and crediting them with a less amount received by the plaintiffs, John Borrowscale and Joseph W. Gregg, partners under the firm of John Borrowscale & Co from a sale of the coal after

the defendants refused to receive it. The answer denied the making of any contract with the plaintiffs; and set up the statute of frauds.

At the trial in the superior court, before *Ames*, C. J., it appeared that the plaintiffs, whose place of business was in Boston, were agents for the sale of the coal of the St. Clair Mining Company, " having the exclusive sale of that corporation's coal for all places east of Rhode Island," their course of business being " to receive orders, transmit them to Philadelphia, and cause the coal so ordered to be forwarded by sea, to be unloaded from the vessel on the premises of the purchaser," for which " they charged commissions to their principals, and they guaranteed all sales made here."

Charles E. Page, the treasurer of the St. Clair Mining Company, testified that in March 1865 at an interview with the defendants, who were dealers in coal, at their wharf in Boston, they proposed to buy a cargo of " the coal," and he said that he would take their order, and it was arranged that a cargo should be sent to them in a vessel " drawing not more than eleven feet of water, and, if convenient or practicable, having not over twenty-eight feet breadth of beam; " that he told the defendants that the plaintiffs were the selling agents of the company; that before he left Boston he gave the plaintiffs notice that he had obtained this order for them; and that, on arriving at Philadelphia, not being able to find a vessel of so narrow beam as twenty-eight feet, he loaded a cargo on the schooner Alderdice, which drew less than eleven feet of water but was twenty-nine feet and one inch wide in the beam.

The plaintiff Gregg testified that the plaintiffs on March 15 received by mail from Philadelphia the bill of lading of the coal thus shipped, expressed therein as " shipped by the St. Clair Coal Company" consigned " to Bosworth & Hamlin; " and made out a bill of the coal against the defendants, beginning thus : " Bosworth & Hamlin, Bought of John Borrowscale & Co., Commission Coal Merchants, St. Clair Co.'s Rainbow Coal; " and left both at the defendants' counting-room on the same day; that he knew that ' there had been a contract," but

" the bill of lading gave him the first knowledge he had of the shipment;" that on receiving the bill of lading the plaintiffs credited on their books " the amount of the sale " to the St. Clair Mining Company, and had since accounted for it " as sold and guaranteed by them;" and that on March 25, before the arrival of the schooner in port, the defendant Hamlin brought both bills back to the plaintiffs, saying that the vessel was too large to go into the defendants' dock, and the plaintiffs " refused to take back the bills," and offered to substitute a smaller vessel and cargo at the same rate, but Hamlin refused the offer, and went away, leaving the bills.

The plaintiff Borrowscale testified " that one of the defendants had been told that the plaintiffs were the selling agents, and had informed him that the defendants had ordered a cargo from the company ; " that he was present at the interview with Hamlin on March 25, which was substantially as described by Gregg; and " that the coal was insured in an open policy in the name of the plaintiffs after the plaintiffs received the bill of lading." And Charles F. Rand testified that he was in the plaintiffs' counting-room at the time of the interview on March 25; confirmed Gregg's account of it ; and added that Gregg asked Hamlin why he did not return " the bill " earlier, if he did not mean to receive the coal.

It appeared in evidence that the vessel arrived at Boston on March 27, and was moored at or near the wharf of the defendants ; that the master repeatedly offered to unload the coal, but the defendants refused to receive it; and that after a delay of three days the vessel was hauled to another wharf, where the coal was then sold by the plaintiffs. There was also evidence tending to show that, as the vessel was moored at or near the defendants' wharf, it would have been impossible for the coal to have been discharged on their premises; but the same witnesses, on cross-examination, testified, as matter of opinion, that the vessel could have been moored further up the dock, and discharged at one of the regular berths at the wharf.

The defendant Hamlin testified that the contract of the defendants was " wholly with Page," and that it was distinctly

agreed that the shipment was to be made in a vessel of not more than twenty-eight feet breadth of beam ; that the defendants " did not know that the plaintiffs had anything to do with the contract, and their names were not mentioned in it; " that two days after the bill of lading came he told the plaintiff Borrowscale that the stevedore said that he could not get the vessel to the defendants' wharf, and Borrowscale said that he would put that cargo elsewhere and get them another one; and that, " finding that Borrowscale did nothing about it," he " returned the bill of lading on March 25, and it was accepted by the plaintiffs." But Borrowscale, being recalled by the plaintiffs, denied that he ever had any conversation with Hamlin between March 15 and March 25.

The defendants contended that, on all the testimony, " there was no proof, as matter of law, of a contract between the plaintiffs and the defendants; and also that there was, as matter of law, no proof of such a delivery and acceptance of the coal as to satisfy the statute of frauds." And the judge ruled that the plaintiffs were not entitled to recover; directed a verdict for the defendants ; and reported the case for the revision of this court.

*W. Gaston & J. M. Keith*, for the plaintiffs.

*F. A. Brooks*, for the defendants.

HOAR, J. The question whether the oral contract for the sale of this cargo was upon the condition that it should be shipped in a vessel which could discharge at the defendants' wharf should have been submitted to the jury, if it was material to the decision of the case, because the evidence upon it was conflicting. The further question, whether the lapse of time between the receipt of the bill of lading by the defendants and their sending it back to the plaintiffs, in connection with the other circumstances of the case, showed an intention on the part of the defendants to assume the ownership of the cargo, so that there was an acceptance of the bill of lading; and thereby an acceptance of the cargo. was also a question of fact upon which the verdict of a jury was necessary. *Morton v. Tibbett*, 15 Q. B 428. *Bushel v. Wheeler*, Ib. 442.

But there is a more substantial objection to the maintenance of the action, in the want of sufficient evidence to prove that, if the defendants made a valid contract with any one, they made it with the plaintiffs. The defendants ordered the cargo of coal from the St. Clair Mining Company, through Mr. Page, the treasurer of the company. The bill of lading was made from the mining company as shippers, directly to the defendants as consignees. If there was an acceptance of the bill of lading, as a delivery of the coal, it was therefore an acceptance of a transfer of the coal directly from the company to them. The bill of lading was not made to the plaintiffs, and indorsed by them to the defendants. It was merely sent to the defendants through their hands, giving them no title to the property. The testimony that the treasurer of the company told the defendants that the plaintiffs were their selling agents, and that the defendants knew the fact, does not tend to prove that the defendants agreed to contract with the plaintiffs. They had made the contract with the company through another agent, and told the plaintiffs that they had ordered a cargo from the company. That the plaintiffs credited the company with the cargo, charged a guaranty commission, and effected insurance upon it, were all *res inter alios,* to which the defendants were not a party. The statement of the treasurer to the plaintiffs, that he had got this order for them, was not made until after the defendants had made the bargain with the company through him ; the defendants were not privy to it, and never assented to the substitution. The bill for the coal, which was made out in the plaintiffs' name, and delivered with the bill of lading, was not in pursuance of any contract which the defendants had made, and gave the defendants no title. They did not return it, but it was not of any value, and the evidence did not show that they assented to it, or ever claimed any rights under it. The treasurer had no authority from the plaintiffs to act for them, at the time when he made the bargain on behalf of the company with the defendants.

Under these circumstances, we know of no authority for the doctrine that the mere right to sue can be transferred, without

the act and assent of both parties to the contract. A principal may sue, where the contract is made through an agent; because he is the party in interest, and the consideration moves from him, although the other party may have supposed that he was dealing with the agent only. An agent may sue upon a promise made directly to him, although the principal might also sue upon the same contract. But here the plaintiffs were neither the owners of the property, nor was the title to it ever transferred to them, nor did the defendants make them any promise. The defendants ordered the coal from the company, and their promise, express or implied, was to the company, and not transferable without their consent.

*Judgment for the defendants on the verdict.*